IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LISA CHIARA,

    Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

No. 2:16-CV-2006-DMC

MEMORANDUM OPINION AND ORDER

        Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties (Docs. 6 and 21), this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are the parties' cross-motions for summary judgment (Docs. 13 and 17).

        The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole,

including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## I. THE DISABILITY EVALUATION PROCESS

To achieve uniformity of decisions, the Commissioner employs a five-step sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f). The sequential evaluation proceeds as follows:

Step 1  Determination whether the claimant is engaged in substantial gainful activity; if so, the claimant is presumed not disabled and the claim is denied;

Step 2  If the claimant is not engaged in substantial gainful activity, determination whether the claimant has a severe impairment; if not, the claimant is presumed not disabled and the claim is denied;

Step 3  If the claimant has one or more severe impairments, determination whether any such severe impairment meets or medically equals an impairment listed in the regulations; if the claimant has such an impairment, the claimant is presumed disabled and the clam is granted;

Step 4  If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied;

2

| | |
|---|---|
| Step 5 | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See id.

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months. See 42 U.S.C. § 1382c(a)(3)(A). The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989). The claimant has the initial burden of proving the existence of a disability. See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work. See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy. See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## II. THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on October 1, 2012. See CAR 14.[1] In the application, plaintiff claims disability began on October 1, 2011. See id. Plaintiff's claim was initially denied. Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on December 23, 2014, before Administrative Law Judge (ALJ) Carol L. Buck. In a March 16, 2015, decision, the ALJ concluded plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairment(s): multiple sclerosis with amnestic disorder;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the following residual functional capacity: light work; claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she cannot climb ladders, ropes, or scaffolds; she can frequently reach with the extremities; she cannot work around heights and moving machinery; she must avoid concentrated exposure to heat; she can perform simple, repetitive tasks;

4. Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

See id. at 16-24.

After the Appeals Council declined review on June 22, 2016, this appeal followed.

## III. DISCUSSION

In her motion for summary judgment, plaintiff argues: (1) the ALJ improperly ignored relevant medical opinions; (2) the ALJ failed to provide sufficient reasons for discounting her statements and testimony as not credible; (3) the ALJ failed to properly evaluate lay witness evidence offered by plaintiff's husband; and (4) the ALJ failed to accept relevant testimony offered by the vocational expert.

---

[1] Citations are the to the Certified Administrative Record (CAR) lodged on May 23, 2017 (Doc. 11).

4

## A. **Evaluation of the Medical Opinions**

At Step 4 the ALJ evaluated the medical opinion evidence to determine plaintiff's residual functional capacity. See CAR 21-22. In section VI, subsection A of her brief, plaintiff argues the ALJ improperly ignored medical opinions offered by treating physician, Dr. Lui, and Nurse Practitioner, Michael Simpson, including opinions relating to fatigue. In section VI subsection B of her brief, plaintiff continues her argument regarding Dr. Lui.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and

legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

In this case, the ALJ relied on the opinions provided by consultative examining psychologist, Dr. White, see CAR 21, and consultative reviewing physicians, Drs. Jaituni and Saphir, see id. at 22. As to these sources, the ALJ stated:

> . . .Consultative psychologist Dr. White opined that the claimant could perform simple tasks without limitation but was moderately limited for detailed and complex tasks. Concentration, persistence, and pace were mildly limited as were maintaining regular attendance and associating with day-to-day work activity. There were no limitations in her ability to relate to others, accept instructions from supervisors, or work without special supervision (Ex. 3F/9).
>
> This opinion is given great weight because it is based on direct examination, personal observations, and objective testing, and his opinion is consistent with the claimant's reported symptoms.
>
> * * *
>
> State agency medical consultants S. Jaituni, M.D, and J.R. Saphir, M.D., opined that the claimant could perform light exertional work with occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. She could not climb ladders, ropes, or scaffolds. She could frequently reach with the bilateral upper extremities. She should avoid concentrated exposure to heat, unprotected heights, or heavy machinery (Ex. 1A, 3A).
>
> These opinions are given great weight because they are consistent with the discussed treatment records showing the claimant's conditions are relatively controlled. Moreover, the claimant has consistently demonstrated evidence of considerable mental and physical abilities upon examination.

Id. at 21-22.

The ALJ gave partial to little weight to the opinions of consultative reviewing physicians, Drs. Hoenig and Solomon. See id. The ALJ gave little weight to the opinions offered by Mr. Simpson. See id. at 22. The ALJ did not discuss Dr. Lui.

6

1. Mr. Simpson

As to Mr. Simpson, the ALJ stated:

> Nurse practitioner Michal Simpson, FNP, opined in August 2013 [the claimant] could sit, stand, and walk less than 2 hours in an 8-hour day (Ex. 3F, 5F).
>
> This opinion is given little weight because the report appears to rely heavily on the claimant's own subjective statements rather than on objective findings of physical and/or mental disease, and seems to accept uncritically as true most, if not all, of what the claimant reported. Yet, as discussed elsewhere in this decision, there is reason for questioning the reliability of the claimant's subjective complaints. Further, Mr. Simpson's own findings on examinations fail to support the limitations he provided. His [the claimant's] examinations include few specific objective findings to support his [Mr. Simpson's] opinion as previously discussed above (Ex. 2F, 6F). Finally, this opinion is not consistent with Mr. Simpson's own statements that the claimant is able to do activities of daily living without limitations (Ex. 2F, 6F), other medical evidence, and medical opinions in file.

CAR 22.

Plaintiff's discussion regarding Mr. Simpson is very minimal. According to plaintiff: "The Court [ALJ] gave little weight to the opinions of treating nurse practitioner Michael Simpson, FNP because the report was stated to rely on Ms. Chiara's subjective statements (Tr. 22)."

Plaintiff fails to identify any error in the ALJ's evaluation of Mr. Simpson's opinion, and the court finds the ALJ's conclusion is based on legally sufficient reasons supported by the record. A review of Mr. Simpson's August 2013 source statement reflects that, while Mr. Simpsons expresses a number of specific opinions, he does not cite to any clinical findings to support them. See CAR 341-51 (Exhibits 4F and 5F). Indeed, Mr. Simpson's own observation that plaintiff is capable of performing activities of daily living without limitation undermines his opinions. The ALJ may discount opinions, such as those expressed by Mr. Simpson in this case, which are conclusory. See Meanel, 172 F.3d at 1113; see also Magallanes, 881 F.2d at 751.

/ / /

/ / /

/ / /

/ / /

/ / /

2. Dr. Lui

Plaintiff argues the ALJ erred by not considering Dr. Lui's opinions despite acknowledging them at the hearing.[2] Plaintiff contends:

> As discussed above, Dr. Lui opined as follows; Ms. Chiara could sit or stand/walk or sit, stand, walk for less than two hours in an eight-hour day even with normal breaks; could only stand for five minutes, needs a sit/stand option, can only bend or twist ten percent of the time, has significant limitations with reaching, handling, or fingering; needs unscheduled work breaks every one and one-half hours for an undetermined period of time; and, would miss about three days of work per month. (Tr. 349-551).

Plaintiff also argues the ALJ failed to consider that Dr. Lui adopted Mr. Simpson's August 2013 source statement.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[2] Plaintiff references the following exchange at the hearing:

ALJ: -- came in December 4th. Let's pull that up. And it's not attached to that, but let's see if it was scanned into the bottom. We did have additional records scanned in on December 4th, 11 pages. That's Exhibit 6F. Those records go up to October 25th, 2014, so that appears to be the most current. Do you have any objections to any of the evidence of record or the qualifications of the vocational expert?

ATTY: No, Your Honor. I will point out that the medical source statement, when we say that it was prepared by the physician's assistant that worked for Dr., I think it's Lou. Is it Lou?

CLMT: Dr. Louey [phonetic].

ATTY: Louey. We then sent it back and asked Dr. Louey to sign it and agree to it, and he did that. So 4F and 5F are the same except for the signature of the treating physician.

ALJ: I noted that. It's the same day you just had him add his signature?

ATTY: Yes.

CAR 33.

8

The court has reviewed Dr. Lui's records at Exhibit 5F. See CAR 345-351.[3] These records consist of the same medical source statement completed by Mr. Simpson. See id. at 347-51. As discussed above, the ALJ was not required to consider this statement because it is conclusory. See Meanel, 172 F.3d at 1113; see also Magallanes, 881 F.2d at 751.

### B. Assessment of Plaintiff's Credibility

At Step 4, the ALJ considered plaintiff's statements and testimony. See CAR 19-23. The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.
>
> 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

---

[3] Given Dr. Lui's records conclude at page 351 of the record, the court assumes plaintiff's citation to records through page 551 is the result of a typographical error.

9

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See Bunnell, 947 F.2d at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms. See Smolen, 80 F.3d at 1284 (citations omitted). It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made. See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's credibility, the ALJ stated:

> The claimant reported that she stopped working because she was having a hard time with vision on the computer and because of bad fatigue. She was unable to work as many hours or produce as many sales. Her symptoms are worsening, particularly her memory, focus, concentration, and spasticity. She drops things and trips more frequently. She has difficulty lifting, squatting, completing tasks, concentrating, understanding, following directions, and handling stress. She has double vision and ocular flutter where her eye moves ten times a second. This is triggered by television, computer monitor, writing, or bright lights. When this happens, she has to lie down with her eyes closed and rest for about 45 minutes. They eye fluttering also triggers icepick headaches similar to migraines, which occur once or twice a week. Her typing skills have decreased due to finger spasticity. She used to type 100 words per minute but now types about 20 words per minute. Sometimes her finger will move of its own volition. She drops things every day and has difficulty picking things up and flipping things over. She wants to pick things up but her arms will not move. She has difficulty remembering and thinking sometimes. She has difficulty reading. She has to read aloud to herself and has to read things a few times before it sinks in. She has been reading the same book for the past 6 months and has to go back and re-read. Problem solving and concentrating are hard. She has made errors paying bills. She cannot do math in her head and even counting is difficult. Loud noises and commotion can be distractions. She used to walk her dog but her whole legs would tingle and go numb so she stopped. She does not grocery shop any longer because her toes go numb. She cannot stand for long. She gets cramps in her feet and toes and gets unsteady and shaking. She falls all the time. She estimated she could be on her feet for 5 to 10

minutes. She only walks when necessary. She mostly stays home and does not really go places anymore. She does not wash dishes anymore because she had broken several glasses. She usually goes back to bed after her daughter goes to school. She lies down a couple of times a day for 45 minutes to a couple of hours due to fatigue. She does not sleep well at night because of restless legs and foot/toe cramping. She feels exhausted in the morning. She mostly wears a hat because styling her hair is fatiguing. She has difficulty getting to the toilet on time. She takes LDN daily. She was initially treated with Avonex shots but she could not tolerate the side effects.

* * *

These allegations are inconsistent with clinical indications showing her condition is well controlled with minimal treatment. Although the claimant alleges disability since October 2011, the record is devoid of any treatment prior to May 2012. In fact, at that time, the claimant was not taking any medications. She described her symptoms as "mild and unchanged" and she reported she was able to "do activities of daily living without limitations." The examination was unremarkable, including a normal gait and no impairment of memory (Ex. 2F/10). Subsequent treatment notes show few, if any, objective findings and she did not require any specialty referrals, regular neurological follow up, or specialty testing. Moreover, she was infrequently seen by her primary care provider. The record documents clinic visits due to multiple sclerosis complaint on merely 6 occasions in the relevant period: May 30, 2012, September 25, 2012, March 29, 2013, April 23, 2013, August 13, 2013, and March 4, 2014 (Ex. 2F, 6F). Social Security Ruling 96-7p states that had the claimant genuinely felt debilitating symptoms, it would have been more likely that she would sought [sic] more aggressive and frequent treatment.

Admittedly, the claimant takes low-dose naltrexone [LDN] for her condition. However, she has not required frequent increases or changes in medications. In fact, the medication was not prescribed by her treating source; she requested this medication herself (Ex. 2F/10). In March 2013, the claimant admitted that she was not being treated for multiple sclerosis and further admitted that she obtained a supply of LDN from Great Britain "while we were waiting for medical records and approval to start the medication." Moreover, she reported that her right leg symptoms had improved and the medication had "significantly improved her overall quality of life" (Ex. 2F/5).

The claimant's subjective complaints find little support in the treatment record. For example, the claimant alleges that she falls frequently. However, she has never been injured or sought medical treatment following a fall. She has not complained of falling episodes to her treating source (Ex. 2F, 6F, hearing testimony). This suggests that she is not falling as frequently as she reports. When the undersigned attempted to clarify her ability to stand and walk, the claimant's answers were vague. Moreover, she admitted that her walking was a little better with medications.

///

11

> While the claimant reported she gets frequent headaches, she admitted that they only last 10 to 15 seconds. She takes no medications for them and seeks no treatment. Further, she admitted they would probably not preclude work (Ex. 9F, hearing testimony). The claimant testified that she has difficulty using her upper extremities to perform tasks such as gripping, reaching, turning, and keyboarding. However, examinations reveal no weakness of her upper extremities and the claimant was able to manipulate test materials and complete written test items during recent psychological testing without any noted difficulties (Ex. 1F, 2F, 3F 6F).
>
> The claimant testified at hearing that she does nothing all day but sit. However, she previously reported she was walking, shopping, cooking, and performing light chores such as laundry (Ex. 1F, 3F, 6F, 12E). She testified that her husband and 12-year-old daughter do these tasks. However, she reported that her husband is receiving disability following a stroke and residuals from brain tumor surgery on his brain from which he did not recover or improve his motor skills and admitted, "he's pretty limited."

CAR 19-21.

The ALJ also found plaintiff's credibility to be undermined by her work history. See id. at 21. Specifically, the ALJ noted plaintiff earned $26,011.27 in 2011, see id. (citing Exhibit 3D), and plaintiff continued to work in 2012, see id. (citing Exhibit 6D). As to employment in 2013, the ALJ stated:

> Additionally, the record shows that the claimant was hired by Allegis Group on July 15, 2013 (Ex. 2D). The claimant testified at hearing that she began a training program for a call center in a customer service position located in Redding. She commuted from her home in Shingletown to Redding and worked 2.5 weeks. She admitted that this work was physically similar to the demands of her past work. When asked why she was terminated, she testified she thought she was doing okay and believed her work performance was successful.

Id. at 21.

Further, the ALJ found plaintiff's allegations to be inconsistent with the medical opinion evidence. See id. Finally, the ALJ stated: "[T]he evidence shows that the claimant's symptoms are mild to moderate at most, and not of such intensity and persistence that they significantly limit her capacity for work." See id. at 23.

///

///

///

Plaintiff argues the ALJ erred by citing to her work at Allegis Group. According to plaintiff:

> So as to evidence these subjective complaints as unreliable, the Court [ALJ] stressed Ms. Chiara was not preventing her from "working" or actively seeking employment which evidences her impairment was not as functionally limiting as she alleges (Tr. 21). The Court stated Ms. Chiara "worked" for 2.5 weeks. Further, it alleged that Ms. Chiara admitted that this "work" was physically similar to demands of her past work (Tr. 21) . This "work" at issue was the twelve week training program that Ms. Chiara was let go of after 2.5 weeks (Tr. 21).
> Again, the Court is ignoring its own findings so as to attack Ms. Chiara's subjective complaints. The Court found that the 2.5 weeks in this training program "wasn't even a work attempt; she was in the training program" (Tr. 34). Yet in the Unfavorable Decision the Court focused upon this "work" attempt and how her impairments did not prevent her from working (Tr. 21).
> The ALJ admitted and accepted that this training program was not work, but in its decision stated it was work and then used this work to improperly determine that Ms. Chiara was not functionally limited as she alleged. The Court then placed error an error and stated Ms. Chiara admitted this "work" (i.e. training program) was physically similar to demands of past work (Tr. 21). Ms. Chiara actually was asked as to what she would be doing if she finished the training program and went to work in a call center. She responded it would be a call center. She was then specifically asked if it would be similar to prior work. Ms. Chiara responded "it was" (Tr. 35).
> Considering the above, how did the Court conclude that Ms. Chiara admitted that the "work" at the training program was physically similar to her past work? Ms. Chiara never made such a statement. This comment was by counsel in reply to the ALJ regarding a separate issue. The ALJ commented upon the testimony of Ms. Chiara as to the job that resulted from the training program would be as to a whole new area of expertise (Tr. 53). Counsel responded that the subsequent job would be the same physically. The ALJ accepted this fact for clarification (Tr. 53).
> The Court again took a training program that it had agreed was not work but twisted the facts to make it actual work so as to attack the credibility of the claimant and her assertions as to ability to function at work.
> The Court was not yet finished with these errors and added one more. It stated that since Ms. Chiara was actively seeking employment that her impairment was not as functionally limiting as alleged (Tr. 21). In fact, Ms. Chiara hoped she could work again but even at the training program for a position that she had performed in similar employment for over twenty years, she was let go after 2.5 weeks for not keeping up (Tr. 34-36). The attempts of Ms. Chiara to see if she could work evidenced she could not do so. It evidenced she lacked the functional capacity to work not that her impairments were not as functionally limiting as she alleged.

/ / /

/ / /

/ / /

13

Plaintiff also contends the ALJ erred by ignoring limitations related to fatigue opined by Dr. Lui:

> The Court [ALJ] also ignored the extent of fatigue suffered by Ms. Chiara. She testified as to a fatigue that was "draining" (Tr. 48). She had needs for extensive naps during the day (Tr. 48). Dr. Lui opined as to fatigue and pain which "constantly" interfered with concentration and attention (Tr. 349). Further, medical records continually mention this chronic fatigue (Tr. 358-359). These records further indicated a lack of energy to even proceed though even a training program (Tr. 357).
> Yet with this significant limiting factor of fatigue, the Court failed to even consider fatigue.

Finally, plaintiff challenges the ALJ's reliance on her failure to seek more aggressive treatment:

> In another attempt to attack the credibility of the claimant, the Court based, upon SSR 96-7p, stated Ms. Chiara should have sought more aggressive treatment (Tr. 20). However, the treatment for MS is medication. Ms. Chiara testified that when first diagnosed with MS she tried Avonex for six months but side effects were so drastic that she had to switch to another medication (Tr. 51). She began a new drug Naltrexone (Tr. 52). Treating physicians however could not immediately prescribe any medications due to delays in obtaining medical records (Tr. 320). Therefore, Ms. Chiara in a desire for medication covered this delay period by obtaining this medication from Great Britain (Tr. 320).
> These acts reflect an individual doing all she could to obtain medication without a delay. Treating physicians agreed as to this medication treatment (Tr. 319). However, the Court instead cites to an individual not aggressively treating an impairment and therefore there could not be debilitating symptoms (Tr. 20). The facts show the opposite. Ms. Chiara was doing all she could to treat her MS with medication; even obtaining medication from Great Britain until she could obtain the delayed prescription from her treating physician.

Notably, in her discussion of alleged flaws in the reasons offered by the ALJ for rejecting her statements and testimony as not credible, plaintiff does not address inconsistencies undermining her credibility. As the ALJ observed, for example, although plaintiff claims disability since October 2011, the record is devoid of any treatment prior to May 2012 and, at that time, plaintiff was not taking any medications and reported she was able to engage in activities of daily living without limitation. See CAR 20. Additionally, while plaintiff testified that she sits all day, she reported in written statements that she walks, shops, and performs light chores. See id. (citing Exhibits 1F, 3F, 6F, 12E). In this regard, plaintiff's testimony that her husband and 12-year-old daughter perform these tasks is inconsistent with plaintiff's report that her husband is "pretty limited" following a stroke. See id. Nor does plaintiff discuss her work history more broadly than brief work in 2013 for Allegis Group. As the ALJ also noted, plaintiff continued to

work in 2012, see id. at 21 (citing Exhibit 6D), despite alleging disability beginning on October 1, 2011.

The ALJ did not err by relying on evidence of inconsistencies in plaintiff's statements and testimony to determine they are not fully credible. See Smolen, 80 F.3d at 1284.

### C. Consideration of Lay Witness Evidence

Plaintiff argues the ALJ erred at Step 4 in rejecting evidence offered by her husband, Toby Chiara. In determining whether a claimant is disabled, an ALJ generally must consider lay witness testimony concerning a claimant's ability to work. See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e). Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment." See Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." Dodrill, 12 F.3d at 919. The ALJ may cite the same reasons for rejecting plaintiff's statements to reject third-party statements where the statements are similar. See Valentine v. Commissioner Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (approving rejection of a third-party family member's testimony, which was similar to the claimant's, for the same reasons given for rejection of the claimant's complaints).

The ALJ, however, need not discuss all evidence presented. See Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984). Rather, he must explain why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir.1981). Applying this standard, the court held that the ALJ properly ignored evidence which was neither significant nor probative. See id. at 1395. As to a letter from a treating psychiatrist, the court reasoned that, because the ALJ must explain why he rejected uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was controverted by other medical evidence considered in the decision. See id. As to lay witness testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

///

15

concluded that the evidence was properly ignored because it "conflicted with the available medical evidence" assessing the plaintiff's mental capacity. Id.

In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent disregard of lay witness testimony. See 454 F.3d 1050, 1053-54 (9th Cir. 2006). The lay witness had testified about the plaintiff's "inability to deal with the demands of work" due to alleged back pain and mental impairments. Id. The witnesses, who were former co-workers testified about the plaintiff's frustration with simple tasks and uncommon need for supervision. See id. Noting that the lay witness testimony in question was "consistent with medical evidence," the court in Stout concluded that the "ALJ was required to consider and comment upon the uncontradicted lay testimony, as it concerned how Stout's impairments impact his ability to work." Id. at 1053. The Commissioner conceded that the ALJ's silent disregard of the lay testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth Circuit rejected the Commissioner's request that the error be disregarded as harmless. See id. at 1054-55. The court concluded:

> Because the ALJ failed to provide any reasons for rejecting competent lay testimony, and because we conclude that error was not harmless, substantial evidence does not support the Commissioner's decision . . .

Id. at 1056-67.

From this case law, the court concludes that the rule for lay witness testimony depends on whether the testimony in question is controverted or consistent with the medical evidence. If it is controverted, then the ALJ does not err by ignoring it. See Vincent, 739 F.2d at 1395. If lay witness testimony is consistent with the medical evidence, then the ALJ must consider and comment upon it. See Stout, 454 F.3d at 1053. However, the Commissioner's regulations require the ALJ consider lay witness testimony in certain types of cases. See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13. That ruling requires the ALJ to consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that are not shown by the medical evidence. See id. Thus, in cases where the plaintiff alleges impairments, such as chronic fatigue or pain (which by their very nature do not always produce clinical medical evidence), it is impossible for the court to conclude that lay witness evidence

16

concerning the plaintiff's abilities is necessarily controverted such that it may be properly ignored. Therefore, in these types of cases, the ALJ is required by the regulations and case law to consider lay witness evidence.

As to Mr. Chiara, the ALJ stated:

> The record additionally contains a report from Toby Chiara, the claimant's husband, which is generally supportive of the claimant's allegations (Ex. 5E). However, significant weight cannot be given to the third party report because Mr. Chiara is not an acceptable medical source. Moreover, his report, like the claimant's allegations, is not consistent with the preponderance of the opinions and observations by medical doctors in this case.

CAR 23.

In section VI.A. of her brief, plaintiff argues: "The Court [ALJ] treats Mr. Chiara as it would a medical source and not as family member with particular value of his observations."

The court finds no error in the ALJ's evaluation of Mr. Chiara's report. As with plaintiff's statements and testimony, the ALJ found Mr. Chiara's statement is inconsistent with the objective medical evidence as well as the opinion evidence. The ALJ may cite the same reasons to reject similar statements from plaintiff and third-party sources. See Valentine, 574 F.3d at 694 (approving rejection of a third-party family member's testimony, which was similar to the claimant's, for the same reasons given for rejection of the claimant's complaints).

**D.      Vocational Finding**

At Step 5, the ALJ determined whether there are jobs that exist in the national economy that plaintiff can perform given her residual functional capacity. See CAR 23-24. The Medical-Vocational Guidelines (Grids) provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual functional capacity. The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity. See Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the Grids).

/ / /

/ / /

The Commissioner may apply the Grids in lieu of taking the testimony of a vocational expert only when the Grids accurately and completely describe the claimant's abilities and limitations. See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983). Thus, the Commissioner generally may not rely on the Grids if a claimant suffers from non-exertional limitations because the Grids are based on exertional strength factors only.[4] See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(d), (e)). The Commissioner may, however, rely on the Grids even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities. See Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

In cases where the Grids are not fully applicable, the ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations. See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995). Specifically, where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

///

---

[4] Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a). "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. See 20 C.F.R. §§ 404.1567(a) and 416.967(a). "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. See 20 C.F.R. §§ 404.1567(b) and 416.967(b). "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. See 20 C.F.R. §§ 404.1567(c) and 416.967(c). "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. See 20 C.F.R. §§ 404.1567(d) and 416.967(d). "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. See 20 C.F.R. §§ 404.1567(e) and 416.967(e). Non-exertional activities include mental, sensory, postural, manipulative, and environmental matters which do not directly affect the primary strength activities. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

ALJ is required to obtain vocational expert testimony. See Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant. See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989). If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value. See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991). While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole. See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

At Step 5, the ALJ stated:

> If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors, the individual would be able to perform the requirements of the vast majority of light, unskilled work.
>
> Pursuant to SSR [Social Security Ruling] 00-04p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

CAR 24.

///

///

///

According to plaintiff, the ALJ's analysis is flawed because hypotheticals posed to the vocational expert did not account for the need to take unscheduled half-hour breaks, an inability to sit/stand/walk for more than two hours, or "issues with concentration, memory, pain, and fatigue."

Plaintiff's arguments regarding the ALJ's vocational analysis are unpersuasive because, for all the reasons discussed above, the ALJ properly assessed plaintiff's residual functional capacity and found these limitations are not supported by the medical evidence.

## IV. CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis. Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 13) is denied;
2. Defendant's motion for summary judgment (Doc. 17) is granted;
3. The Commissioner's final decision is affirmed; and
4. The Clerk of the Court is directed to enter judgment and close this file.

Dated: September 26, 2018

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE